UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
JOSEPH SAETTA,                                                                     Case No.

                                  Plaintiff,                          **COMPLAINT**

      -against-                                                                    **JURY TRIAL DEMANDED**

TERRANCE RAYNOR, Acting Commissioner-Sheriff,
GEORGE LATIMER, Westchester County Executive,
the WESTCHESTER COUNTY DEPARTMENT of
PUBLIC SAFETY, WESTCHESTER COUNTY, and
CORINNE PASCARIU-COSTO,

                                  Defendants.
------------------------------------------------------------------x

      Plaintiff, JOSEPH SAETTA by his attorneys, BRILL LEGAL GROUP, P.C., as and for his Complaint against Defendants TERRANCE RAYNOR, Acting Commissioner-Sheriff, GEORGE LATIMER, Westchester County Executive, the WESTCHESTER COUNTY DEPARTMENT of PUBLIC SAFETY, and WESTCHESTER COUNTY, alleges as follows:

## INTRODUCTION

      This is a civil rights action on behalf of Plaintiff JOSEPH SAETTA (hereinafter referred to as "plaintiff") to vindicate his rights as an employee of defendant WESTCHESTER COUNTY as a result of defendants' unlawful conduct, along with related claims against Defendant CORINNE PASCARIU-COSTO, a resident of New Jersey whose actions led to the termination of Plaintiff's employment.

1

**JURISDICTION AND VENUE**

1. The jurisdiction of this Court is invoked pursuant to 18 U.S.C. § 1965, 28 U.S.C. §§ 1331, 1343 and 2202 to secure protection of and to redress deprivation of rights secured by the United States Constitution, as well as 28 U.S.C. 1332 as to the claims against Defendant Corinne Pascariu-Costo.

2. The unlawful employment practices and violations of plaintiff's civil rights complained of herein were committed in Westchester County, New York, within the Southern District of New York.

**PROCEDURAL REQUIREMENTS**

3. Plaintiff has filed suit with this Court within the applicable statute of limitations period.

**PLAINTIFF**

4. Plaintiff JOSEPH SAETTA is a male citizen of the United States of America, over twenty-one (21) years of age, resident of Rockland County and was employed as a police officer by defendant WESTCHESTER COUNTY through the WESTCHESTER COUNTY DEPARTMENT OF PUBLIC SAFETY (hereinafter referred to as "DPS") until he was unlawfully terminated on January 31, 2024.

**DEFENDANTS**

5. Defendant, TERRANCE RAYNOR, Westchester Acting Commissioner-Sheriff, is a public officer who is named in his official capacity.

6. Defendant, GEORGE LATIMER, Westchester County Executive, is a public officer who is named in his official capacity.

2

7.     Defendant, WESTCHESTER COUNTY, is a Municipal Corporation duly incorporated and existing pursuant to the laws of the State of New York. Westchester County has established and maintains the WESTCHESTER DEPARTMENT OF PUBLIC SAFETY as a constituent department or agency.

8.     Defendant, CORINNE PASCARIU-COSTO, is an individual who resides in Alpine, New Jersey.

## BACKGROUND

9.     Plaintiff is dedicated to pursuing a career in law enforcement, and he was steadily moving from smaller police departments to larger police departments where he could advance his career. He initially worked part time for both the Tuxedo Park Village Police Department and the Fishkill Town Police Department. In May 2021, he moved to the Mount Vernon City Police Department, transferring to the Pleasantville Village Police Department in 2022. He left Pleasantville to become a Westchester County Police Officer.

10.     During that time, following his police academy training course, and often at his own expense, Plaintiff complete coursework in Basic Criminal Investigations, Basic Investigative Photography, Breath Analysis, Patrol Rifle, Police Crime Scene and Evidence, Principled Policing - Procedural Justice, Property/Evidence Room Management, and Radar/Lidar Operation. He even took the Police Field Training Officer Course, which, as seen below, is ironic.

11.     On October 30, 2023, Plaintiff was appointed to the competitive civil service position of police officer with the Westchester County Department of Public Safety ("DPS") in a probationary capacity.

12. At all times relevant hereto, Plaintiff was a member of the Westchester County Department of Public Safety PBA, Inc., his collective bargaining unit with the DPS and Westchester County ("County").

13. Probationary police officers are required to be evaluated by a New York State certified Field Training Officer ("FTO") who rides with the probationary officer during traffic enforcement. As per DPS Captain James Greer, the DPS Patrol Division commander, probationary officers are also required to effect at least one DWI arrest before they are removed from probation.

14. Plaintiff underwent one week of in-service training following his October 30, 2023 hire date with DPS. He was then assigned to the Westchester County Airport until an FTO became available for training.

15. On or about December 3, 2023, DPS assigned Plaintiff an FTO named Mohammad Chandoo. Police Officer Chandoo, a seven-year member of the DPS, is not a state-certified FTO and had only been assigned to train one other police officer during his career.

16. On the evening of December 6, Plaintiff was in a patrol car with Officer Chandoo when they effected a traffic stop of a motorist later identified as Corinne Pascariu-Costo. The motorist was driving a vehicle with an expired temporary New Jersey license plate. She could not produce a driver's license, which she claimed was in the trunk.

17. After failing to produce a driver's license, the motorist took out a black leather wallet which contained a small police shield and a "PBA card", a card issued by a police union to identify friends, family members, or other individuals shown favor by police union members. The motorist identified herself as "a family member".

18.     Despite having no official or legal standing, PBA cards have been called "get out of jail free cards."[1] They have also been the subject of press attention and scandal.[2] Many police agencies look the other way when their officers choose to exercise discretion and not issue a ticket to a motorist in possession of a PBA card. However, there are no official rules in any law enforcement agency, including the DPS, stating that motorists in possession of PBA cards are not subject to enforcement of the laws of the State of New York. This, of course, is due to many factors, including, as one veteran detective told the BBC, "That's not to say that they didn't find that card in the floor of a men's room and stuck it in their wallet either."[3] For Plaintiff, it was the unwritten rule of DPS higher-ups, that he was unaware of, that would lead to his current position.

19.     During the traffic stop of Ms. Pascariu-Costo, Plaintiff looked at the mini-shield and PBA card, noted to himself that he did not recognize the agency allegedly associated with the PBA card, and returned the wallet to the motorist. When he returned to the patrol car, he did not tell Officer Chandoo about it, thinking it was irrelevant and, as stated, within his discretion how to respond to the motorist. After an investigation, he decided to issue a ticket for a single minor traffic infraction and, with Chandoo's approval, did so. The entire series of events was captured

---

[1] See, e.g., "Police union slashes number of 'get out of jail free' cards issued," *New York Post*, January 21, 2018, found at https://nypost.com/2018/01/21/police-union-slashes-number-of-get-out-of-jail-free-cards-issued/ and "How to Buy New York City's 'Get Out of Jail Free' Card," *Lifehacker*, January 23, 2018, found at https://lifehacker.com/how-to-buy-new-york-citys-get-out-of-jail-free-card-1822312921, both visited on March 3, 2024.

[2] See, e.g., An Idealistic Cop, a Forbidden Ticket and a Police Career on the Brink," *New York Times*, January 16, 2024, found at https://www.nytimes.com/2024/01/16/nyregion/mathew-bianchi-nypd-traffic-tickets.html?searchResultPosition=2 and "Officers Jeer at Arraignment of 16 Colleagues in Ticket-Fixing Investigation," *New York Times*, October 28, 2011, found at https://www.nytimes.com/2011/10/29/nyregion/officers-unleash-anger-at-ticket-fixing-arraignments-in-the-bronx.html?_r=1&scp=1&sq=police%20ticket%20fixing%20case&st=cse, both visited on March 3, 2024.

[3] "'Get out of jail free': Will this card get you off a speeding ticket?" BBC.com, January 23, 2018, found at https://www.bbc.com/news/world-us-canada-42780382, visited on March 3, 2024.

on Plaintiff's body-worn camera. Plaintiff was courteous to the motorist during the entire interaction.

20. Shortly thereafter, Ms. Pascariu-Costo called the desk officer at Plaintiff's command and made a complaint about him. Officer Chandoo was allegedly asked whether the motorist had shown a PBA card, which Officer Chandoo denied. Chandoo then asked Plaintiff, who confirmed that he believed he had seen a card from an unfamiliar organization.

21. At no time and in relation to no other incident was it ever alleged that Plaintiff lacked integrity, was dishonest or unprofessional. There were no negative incidents. Officer Chandoo was merely conveying the displeasure of the DPS bosses who got a complaint that Plaintiff had lawfully exercised his discretion to write a traffic summons for a motorist engaged in illegal activity who had tried to avoid the consequences of her actions by flashing a PBA card and claiming to be "a family member." What was clear was that had Plaintiff told Officer Chandoo that Ms. Pascariu-Costo had flashed the PBA card, Chandoo would have followed the DPS's unwritten rule and told Plaintiff not to issue the summons.[4]

22. On or about December 9, 2023, Officer Chandoo informed Plaintiff that Ms. Pascariu-Costo's complaint had been escalated to DPS upper management and that other officers have been disciplined for "writing over" PBA cards, i.e. issuing tickets to motorists who provide them.

23. On December 17, 2023, Plaintiff effected a DWI arrest, completing his field training requirements. Officer Chandoo sent Plaintiff a text message confirming that the arrest was good and later congratulated him on passing field training.

---

[4] Even so, Chandoo, being of equal rank to Plaintiff, had no legal command authority over him and could not order Plaintiff to do anything.

24. On December 19, 2023, Plaintiff was called into Captain Greer's office and was told that Commissioner Raynor was reviewing Ms. Pascariu-Costo's complaint and was deciding whether Plaintiff would fail his probation as a result.

25. On December 20, 2023, Plaintiff was informed that Raynor had told multiple people, both within and outside the DPS, that the entire issue revolved around Plaintiff having written over a PBA card.

26. On or about January 9, 2024, without any additional investigation by superiors, Officer Chandoo was directed to complete all "Probationary Officers Evaluation Reports" for Plaintiff and backdate them. Plaintiff was given passing grades of 4 on all evaluation reports, except for December 6, 2023, where he was scored a 1. Chandoo's evaluation for December 6 states, "P.O. Saetta needs to show more ***discression*** [sic] and professionalism with dealing with the public. He needs to show more honesty and integrity when dealing with review of negative incidents and be more fourth [sic] coming when dealing with the public. P.O. Saetta needs to be honest with his FTO and peers when dealing and reviewing incidents that may be difficult" [emphasis added]. Despite the December 6 report, based on the scores of 4 on all other reports, Plaintiff passed field training.[5]

27. On January 12, 2024, Plaintiff was again called into Captain Greer's office. Sergeant McNulty from Internal Affairs was also present. Greer told Plaintiff that he was terminated from his position, handed Plaintiff a letter to that effect, and placed Plaintiff on administrative leave through January 31, 2024.

28. After leaving Greer's office with McNulty, McNulty expressed confusion as to how Plaintiff wound up terminated, as Internal Affairs should have had been notified of any allegations

---

[5] If Chandoo had been a trained and certified FTO to begin with.

of misconduct but had no information about any allegations against Plaintiff and had not conducted an investigation.

29. Plaintiff spoke with his union President and counsel later that day, who both confirmed that they had spoked to Raynor, that Plaintiff was being terminated for writing over a PBA card, and that no one had ever been fired for this previously.

30. To add confusion to this matter, perhaps in an attempt to avoid the consequences of his actions, Commissioner Raynor sent a letter to Plaintiff on January 22, 2024 that read, in pertinent part:

> This communication will confirm that Police Officer Joseph Saetta separated from service with the Westchester County Department of Public Safety effective January 31, 2024. This separation of service was during his probation and was neither a "removal for cause" as such term is defined by 9 NYCRR 6056.2(h) nor a "removal during a probationary period" as such term is defined by 9 NYCRR 6056.2(i),
> Police Officer Saetta has never, during his employment by the Westchester County Department of Public Safety, been the subject of a disciplinary investigation or been the subject of any of misconduct, including such misconduct as is described in 9 NYCRR 6056.2(h)(1).

31. From the time of the initial traffic stop in question until his termination date, Petitioner had many conversations with members of the DPS, members of the PBA, public officials, the public, family, friends, and acquaintances about the public policy issues surrounding police discretion and PBA cards, as well as the absurdity of the DPS policy that no PBA cards should be written over. These conversations were outside the scope of Petitioner's normal employment.

32. These discussions about the use of PBA or other union courtesy cards to avoid discipline for infractions of law addressed a matter of public concern.

8

33. For example, Saetta observed, and discussed the fact with the individuals listed above, that in practice, people who have PBA Cards drive in a much more dangerous and unlawful ways because they do not fear getting traffic tickets, thus creating a hazard to public safety.

34. In addition, Saetta noted and discussed with those listed above that white drivers in Westchester County were significantly more likely to have PBA cards than minority drivers. As such, minority drivers received traffic infractions at a higher rate than white drivers.

35. From December 6, 2023, through his termination and until the present date, Plaintiff has repeatedly engaged in protected activity and speech by complaining about the DPS's unwritten rule regarding never writing over a PBA card.

36. Plaintiff made these complaints outside the scope of his normal employment.

37. These complaints were made both inside and outside of Plaintiff's workplace.

38. Plaintiff often made complaints within his command structure to supervisors and to public officials outside the time of his scheduled work tours.

39. The complaints of preferential treatment and lack of enforcement of traffic infractions against motorists who possess PBA Cards is a matter of public concern in that, among other reasons, a) civilians who have these cards often drive in a reckless manner, without fear of being prosecuted, which puts the public at risk due to their reckless driving; and b) due to the fact that a disproportionate number of motorists producing PBA Cards after traffic stops are white, traffic tickets are disproportionately issued to members of racial minorities.

40. For the reasons stated above, Plaintiff was subjected to adverse actions due to his engagement in protected speech.

41. Such adverse actions taken against Plaintiff were done purposefully to deter Plaintiff, and others who could engage in protected speech, from engaging therein.

**FIRST CAUSE OF ACTION**
**AS TO DEFENDANTS TERRANCE RAYNOR, GEORGE LATIMER,**
**WESTCHESTER COUNTY DEPARTMENT of PUBLIC SAFETY, AND**
**WESTCHESTER COUNTY**
**FIRST AMENDMENT RETALIATION**
**DEPRIVATION OF FEDERAL RIGHTS UNDER 42 U.S.C. § 1983**

42. All previous allegations of this Complaint are incorporated herein as if fully set forth below.

43. All of the aforementioned acts of defendants, their agents, servants and employees, were carried out under the color of state law.

44. All of the aforementioned acts deprived plaintiff of the rights, privileges and immunities guaranteed to citizens of the United States by the First Amendment to the Constitution of the United States of America and in violation of 42 U.S.C. § 1983.

45. The acts complained of were carried out by the aforementioned individual defendants in their capacities as public officers, with all the actual and/or apparent authority attendant thereto.

46. The acts complained of were carried out by the aforementioned individual defendants in their capacities as public officers, pursuant to the customs, usages, practices, procedures, and the rules of Westchester County and the Westchester County Department of Public Safety, all under the supervision of ranking officers of said county and department.

47. Defendants, collectively and individually, while acting under color of state law, engaged in conduct which constituted a custom, usage, practice, procedure, or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

## SECOND CAUSE OF ACTION
## AS TO DEFENDANTS TERRANCE RAYNOR, GEORGE LATIMER, WESTCHESTER COUNTY DEPARTMENT of PUBLIC SAFETY, AND WESTCHESTER COUNTY
## FIRST AMENDMENT RETALIATION

48. All previous allegations of this Complaint are incorporated herein as if fully set forth below.

49. Defendants' infringement upon and violation of Plaintiff's rights protected under the First Amendment to the United States Constitution were intended to harm Plaintiff, and to place a chilling effect upon the exercise of such rights by Plaintiff and other persons as is their right, as provided by the U.S. Constitution.

50. Further, following Plaintiff's engagement in protected speech defendants unconstitutionally used the threat and eventual imposition of termination of employment in an effort to silence, intimidate, threaten, and prevent Plaintiff from disclosing the evidence of corruption and misconduct Plaintiff had been collecting and documenting to the public at large.

51. The aforementioned conduct resulted in a chilling effect on Plaintiff's speech in an effort to prevent him from engaging in protected speech; or alternatively, to ultimately discredit his speech.

52. Defendants' actions violated Plaintiff's First Amendment right to speak out as citizen regarding a matter of extreme public concern, which constituted a fraud on the public and a breach of the public trust – namely widespread corruption, illegal practices, and the manipulation of issuance of civilian infractions due to PBA Cards.

53. Defendants' aforementioned conduct was not authorized by law and instead constituted a continued attempt to restrain plaintiff's speech from ever being uttered, which is presumptively unconstitutional.

54. As such, Defendants' conduct was in direct violation of Plaintiff's right to freedom of speech as secured by the First and Fourteenth Amendments.

55. As a result of this violation, Plaintiff is entitled to compensatory damages, punitive damages, and an award of attorney's fees.

**THIRD CAUSE OF ACTION**
**AS TO DEFENDANTS TERRANCE RAYNOR, GEORGE LATIMER,**
**WESTCHESTER COUNTY DEPARTMENT of PUBLIC SAFETY, AND**
**WESTCHESTER COUNTY**
**VIOLATION OF NEW YORK CIVIL SERVICE LAW 75-B**

56. Plaintiff re-alleges and incorporates all paragraphs contained herein by reference to this Count.

57. New York State Civil Service Law § 75-b provides, in pertinent part: "A public employer shall not dismiss or take other disciplinary or other adverse personnel action against a public employee regarding the employee's employment because the employee discloses to a governmental body information: (i) regarding a violation of a law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety; or (ii) which the employee reasonably believes to be true and reasonably believes constitutes an improper governmental action."

58. "Improper governmental action" is defined in the statute as "any action by a public employer or employee, or an agent of such employer or employee, which is undertaken in the performance of such agent's official duties, whether or not such action is within the scope of his employment, and which is in violation of any federal, state or local law, rule or regulation."

59. Upon receiving Plaintiff's multiple complaints of corruption related to PBA cards made following the December 6 traffic stop, Defendants retaliated against Plaintiff as a public

employee. Plaintiff filed several reports that attempted to redress Defendants' corrupt practices as described herein.

60. These acts as defined by Civil Service Law § 75-b are classified as improper governmental action by a public employee. Plaintiff raised his concerns based on tangible evidence that caused him to reasonably believe Defendants engaged in improper governmental action.

61. As a result of the foregoing, Plaintiff was terminated from his position, his career is irreparably damaged, and he sustained serious emotional distress and financial harm.

62. As a result of Defendants' willful actions, they are liable to Plaintiff.

## FOURTH CAUSE OF ACTION
## AS TO DEFENDANT CORINNE PASCARIU-COSTO
## DEFAMATION

63. Plaintiff re-alleges and incorporates all paragraphs contained herein by reference to this Count.

64. On December 6, 2023, following a lawful traffic stop due to her driving with an expired temporary license plate, Defendant Corinne Pascariu-Costo ("Costo") tried to get out of a ticket by producing what was allegedly a police mini-shield and PBA Card to Plaintiff.

65. Plaintiff exercised his discretion to issue the summons anyway.

66. Shortly thereafter, Costo called Plaintiff's command and spoke to a supervisor to complain about him.

67. Costo claimed that Plaintiff was discourteous to her, a claim belied by Plaintiff's body-worn camera footage.

68. These statements had no basis in truth or fact, and were not authorized by Plaintiff in any way.

69. Costo knew her claims to be untrue.

70. Costo's call to Plaintiff's supervisor in a fit of pique was done with malice and the intention to cause Plaintiff to suffer an adverse employment consequence.

71. As such, Costo defamed Plaintiff.

72. Plaintiff was damaged by the false statements. These false statements led to reputational harm of Plaintiff by the creation of a false impression of his character. These false statements also caused damage to Plaintiff and his career, including but not limited to among colleagues, supervisors and management at DPS. As the false statements were added to Plaintiff's personnel file and will be reported to New York State, the damage to Plaintiff was severe and ongoing.

73. Plaintiff has been damaged in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
## AS TO DEFENDANT CORINNE PASCARIU-COSTO
## DEFAMATION PER SE

74. Plaintiff re-alleges and incorporates all paragraphs contained herein by reference to this Count.

75. A false statement constitutes defamation per se when it charges another with a serious crime or tends to injure another in his or her trade, business, or profession.

76. As set forth above, Costo communicated false and defamatory statements to DPS employees regarding Plaintiff that defamed Plaintiff's character and reputation and injured Plaintiff in his business and profession.

77. The false statements made by the Defendant concerning Plaintiff are defamatory *per se*, and malign his honesty, trustworthiness, dependability and professional reputation and character and harm his business affiliations.

78. The defamatory statements damaged Plaintiff financially and emotionally.

14

79. Plaintiff has been damaged in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION
## AS TO DEFENDANT CORINNE PASCARIU-COSTO
## INTERFERENCE WITH BUSINESS RELATIONS

80. Plaintiff re-alleges and incorporates all paragraphs contained herein by reference to this Count.

81. Costo's actions, which led to the termination of Plaintiff's employment, have interfered with Plaintiff's business relations, including prospective and future earning capacity.

82. Costo's actions have made it extremely difficult for Plaintiff to secure employment with a New York State law enforcement agency. Despite numerous applications, Costo's false narrative has been propagated throughout the law enforcement community.

83. Costo's interference was intentional and done solely with malice and with the express purpose of causing harm to Plaintiff's livelihood.

84. Plaintiff has been damaged in an amount to be determined at trial.

## JURY DEMAND

85. Plaintiff demands a trial by jury of all issues in this action that are so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

a. Award compensatory damages for the back pay, front pay, pain, suffering, emotional distress, loss of dignity, humiliation, and damages to reputation and livelihood endured by Plaintiff and all other damages afforded to Plaintiff by statute or otherwise in an amount to be determined at trial;

    b. As to the First, Second and Third Causes of Action, hold all defendants therein joint and severally liable for the actions of any and all of the named defendants therein, for an amount to be determined at trial;

    c. As to the Fourth, Fifth and Sixth Causes of Action, hold Defendant Costo liable for an amount to be determined at trial, and

    d. Grant Plaintiff such other and further relief as may be required in the interest of justice.

Dated: Hempstead, New York
       March 4, 2024

          Yours, etc.

          BRILL LEGAL GROUP, P.C.

          By: Peter E. Brill
          Attorneys for Plaintiff
          64 Hilton Avenue
          Hempstead, NY 11550
          (516) 206-2002