UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x

JOSEPH SAETTA,                                                    Case No. 24-cv-1785 (NSR)

                             Plaintiff,                          **AMENDED COMPLAINT**

             -against-                                           **JURY TRIAL DEMANDED**

TERRANCE RAYNOR, Acting Commissioner-Sheriff,
GEORGE LATIMER, Westchester County Executive,
the WESTCHESTER COUNTY DEPARTMENT of
PUBLIC SAFETY, WESTCHESTER COUNTY, and
CORINNE PASCARIU-COSTO,

                             Defendants.
-----------------------------------------------------------------------x

  Plaintiff, JOSEPH SAETTA by his attorneys, BRILL LEGAL GROUP, P.C., as and for his

Complaint against Defendants TERRANCE RAYNOR, Acting Commissioner-Sheriff, GEORGE

LATIMER, Westchester County Executive, the WESTCHESTER COUNTY DEPARTMENT of

PUBLIC SAFETY, and WESTCHESTER COUNTY, alleges as follows:


## <u>INTRODUCTION</u>

  This is a civil rights action on behalf of Plaintiff JOSEPH SAETTA (hereinafter referred to

as "plaintiff") to vindicate his rights as an employee of defendant WESTCHESTER COUNTY as

a result of defendants' unlawful conduct, along with related claims against Defendant CORINNE

PASCARIU-COSTO, a resident of New Jersey whose actions led to the termination of Plaintiff's

employment.

1

## JURISDICTION AND VENUE

1.      The jurisdiction of this Court is invoked pursuant to 18 U.S.C. § 1965, 28 U.S.C. §§ 1331, 1343 and 2202 to secure protection of and to redress deprivation of rights secured by the United States Constitution, as well as 28 U.S.C. 1332 as to the claims against Defendant Corinne Pascariu-Costo.

2.      The unlawful employment practices and violations of plaintiff's civil rights complained of herein were committed in Westchester County, New York, within the Southern District of New York.

## PROCEDURAL REQUIREMENTS

3.      Plaintiff has filed suit with this Court within the applicable statute of limitations period.

## PLAINTIFF

4.      Plaintiff JOSEPH SAETTA is a male citizen of the United States of America, over twenty-one (21) years of age, resident of Rockland County and was employed as a police officer by defendant WESTCHESTER COUNTY through the WESTCHESTER COUNTY DEPARTMENT OF PUBLIC SAFETY (hereinafter referred to as "DPS") until he was unlawfully terminated on January 31, 2024.

## DEFENDANTS

5.      Defendant, TERRANCE RAYNOR, Westchester Acting Commissioner-Sheriff, is a public officer who is named in his official capacity.

6.      Defendant, GEORGE LATIMER, Westchester County Executive, is a public officer who is named in his official capacity.

7.      Defendant, WESTCHESTER COUNTY, is a Municipal Corporation duly incorporated and existing pursuant to the laws of the State of New York. Westchester County has established and maintains the WESTCHESTER DEPARTMENT OF PUBLIC SAFETY as a constituent department or agency.

8.      Defendant, CORINNE PASCARIU-COSTO, is an individual who resides in Alpine, New Jersey.

## BACKGROUND

9.      Plaintiff is dedicated to pursuing a career in law enforcement, and he was steadily moving from smaller police departments to larger police departments where he could advance his career. He initially worked part time for both the Tuxedo Park Village Police Department and the Fishkill Town Police Department. In May 2021, he moved to the Mount Vernon City Police Department, transferring to the Pleasantville Village Police Department in 2022. He left Pleasantville to become a Westchester County Police Officer.

10.     During that time, following his police academy training course, and often at his own expense, Plaintiff complete coursework in Basic Criminal Investigations, Basic Investigative Photography, Breath Analysis, Patrol Rifle, Police Crime Scene and Evidence, Principled Policing - Procedural Justice, Property/Evidence Room Management, and Radar/Lidar Operation. He even took the Police Field Training Officer Course, which, as seen below, is ironic.

11.     On October 30, 2023, Plaintiff was appointed to the competitive civil service position of police officer with the Westchester County Department of Public Safety ("DPS") in a probationary capacity.

12.     At all times relevant hereto, Plaintiff was a member of the Westchester County Department of Public Safety PBA, Inc., his collective bargaining unit with the DPS and Westchester County ("County").

13.     Probationary police officers are required to be evaluated by a New York State certified Field Training Officer ("FTO") who rides with the probationary officer during traffic enforcement. As per DPS Captain James Greer, the DPS Patrol Division commander, probationary officers are also required to effect at least one DWI arrest before they are removed from probation. *See* Affidavit of Captain Greer.

14.     Plaintiff underwent one week of in-service training following his October 30, 2023 hire date with DPS. He was then assigned to the Westchester County Airport until an FTO became available for training.

15.     On or about December 3, 2023, DPS assigned Plaintiff an FTO named Mohammad Chandoo. Police Officer Chandoo, a seven-year member of the DPS, is not a state-certified FTO and had only been assigned to train one other police officer during his career. This violated both DPS and New York State DCJS policy, as well as generally accepted law enforcement good practice. Chandoo had also been previously observed sleeping while on duty on multiple occasions and had escaped disciplinary action for it, despite supervisors being well aware of the situation.

16.     On the evening of December 6, Plaintiff was in a patrol car with Officer Chandoo when they effected a traffic stop of a motorist later identified as Corinne Pascariu-Costo, an attorney. The motorist was driving a vehicle with an expired temporary New Jersey license plate. She could not produce a driver's license, which she claimed was in the trunk.

17.    After failing to produce a driver's license, the motorist took out a black leather wallet which contained a small police shield and a "PBA card", a card issued by a police union to identify friends, family members, or other individuals shown favor by police union members. The motorist identified herself as "a family member".

18.    Despite having no official or legal standing, PBA cards have been called "get out of jail free cards."[1] They have also been the subject of press attention and scandal.[2] Many police agencies look the other way when their officers choose to exercise discretion and not issue a ticket to a motorist in possession of a PBA card. However, there are no official rules in any law enforcement agency, including the DPS, stating that motorists in possession of PBA cards are not subject to enforcement of the laws of the State of New York. This, of course, is due to many factors, including, as one veteran detective told the BBC, "That's not to say that they didn't find that card in the floor of a men's room and stuck it in their wallet either."[3] For Plaintiff, it was the unwritten rule of DPS higher-ups, that he was unaware of, that would lead to his current position.

19.    During the traffic stop of Ms. Pascariu-Costo, Plaintiff looked at the mini-shield and PBA card, noted to himself that he did not recognize the agency allegedly associated with the PBA card, and returned the wallet to the motorist. When he returned to the patrol car, he did not

---

[1] See, e.g., "Police union slashes number of 'get out of jail free' cards issued," *New York Post*, January 21, 2018, found at https://nypost.com/2018/01/21/police-union-slashes-number-of-get-out-of-jail-free-cards-issued/ and  "How to Buy New York City's 'Get Out of Jail Free' Card," *Lifehacker*, January 23, 2018, found at https://lifehacker.com/how-to-buy-new-york-citys-get-out-of-jail-free-card-1822312921, both visited on March 3, 2024.

[2] See, e.g., An Idealistic Cop, a Forbidden Ticket and a Police Career on the Brink," *New York Times*, January 16, 2024, found at https://www.nytimes.com/2024/01/16/nyregion/mathew-bianchi-nypd-traffic-tickets.html?searchResultPosition=2 and "Officers Jeer at Arraignment of 16 Colleagues in Ticket-Fixing Investigation," *New York Times*, October 28, 2011, found at https://www.nytimes.com/2011/10/29/nyregion/officers-unleash-anger-at-ticket-fixing-arraignments-in-the-bronx.html?_r=1&scp=1&sq=police%20ticket%20fixing%20case&st=cse, both visited on March 3, 2024.
[3] "'Get out of jail free': Will this card get you off a speeding ticket?" BBC.com, January 23, 2018, found at https://www.bbc.com/news/world-us-canada-42780382, visited on March 3, 2024.

tell Officer Chandoo about it, thinking it was irrelevant and, as stated, within his discretion how to respond to the motorist. There is a camera mounted on the interior ceiling of the police car that recorded all of the interactions between Chandoo and Saetta. That footage shows that Chandoo never exited the vehicle despite the fact that the FTO policy of the Westchester DPS (and generally accepted law enforcement good practice) requires Field Training Officers to be present at all civilian interactions by trainee officers.

20.    After an investigation, he decided to issue a ticket for a single minor traffic infraction and, with Chandoo's approval, did so. The entire series of events was captured on Plaintiff's body-worn camera. Plaintiff was courteous to the motorist during the entire interaction.

21.    Shortly thereafter, Ms. Pascariu-Costo called the desk officer at Plaintiff's command and made a complaint about him. Officer Chandoo was allegedly asked whether the motorist had shown a PBA card, which Officer Chandoo denied. Chandoo then asked Plaintiff, who confirmed that he believed he had seen a card from an unfamiliar organization.

22.    At no point following the interaction with the motorist did Officer Chandoo ever review the traffic stop with Saetta as required in his position as FTO.

23.    Despite the fact that the call was not recorded as an official civilian complaint it was treated as one. Yet Respondents failed to adhere to their own internal policies with regard to civilian complaints, clear evidence that they acted in bad faith. Section 124.02 of the Police Department Manual addresses procedures to follow when dealing with civilian complaints. As the complainant here made her complaint by telephone, the following steps should have been taken.

    a.    For each Civilian Complaint made, the Desk Officer/Supervisor shall complete a Desk Officer Log Entry in the Records Management System;

> *-- No such Log Entry was made.*

b.    Interview the complainant (on a recorded line when possible);

> *-- The call was not recorded.*

c.    Prepare a Supervisor Incident Report, endorsed with the related Desk Officer Log serial number, particularly describing the complaint and noting that the complaint was received by telephone;

> *-- No Supervisor Incident Report was prepared.*

d.    Ask the complainant to come to headquarters to complete and sign a Civilian Complaint Report.

> *-- The complainant was never asked to come in and did not do so.*

In fact, as Respondents actually admit, the motorist in question declined to file a formal complaint at all. Therefore, as per the same section 124.02,

e.    In the event a complainant fails to cooperate with an ongoing Civilian Complaint investigation, the investigating Supervisor shall record all attempts to contact the complainant in a Supplemental Complaint Report and include same in the case file.

> *-- None of the above occurred. There is no evidence that any supervisor even attempted to contact the motorist, recorded any attempts to do so, or even created a case file.*

24.    At no time and in relation to no other incident was it ever alleged that Plaintiff lacked integrity, was dishonest or unprofessional. There were no negative incidents. Officer Chandoo was merely conveying the displeasure of the DPS bosses who got a complaint that Plaintiff had lawfully exercised his discretion to write a traffic summons for a motorist engaged in illegal activity who had tried to avoid the consequences of her actions by flashing a PBA card

and claiming to be "a family member." What was clear was that had Plaintiff told Officer Chandoo that Ms. Pascariu-Costo had flashed the PBA card, Chandoo would have followed the DPS's unwritten rule and told Plaintiff not to issue the summons.[4]

25.    On or about December 9, 2023, Officer Chandoo informed Plaintiff that Ms. Pascariu-Costo's complaint had been escalated to DPS upper management and that other officers have been disciplined for "writing over" PBA cards, i.e. issuing tickets to motorists who provide them.

26.    To further emphasize that the internal complaint was bogus, no internal affairs log or file was opened, and no internal affairs investigator was even notified. (DPS's internal affairs unit is called the Special Investigations Unit.) Instead, Respondents decided to call their actions an "informal investigation," despite the fact that it led to very formal results. *See* Affidavit of Lieutenant Peters.

27.    The procedure for investigating Category Two internal complaints is laid out in paragraph 19 and after of Section 107.01 of the Police Department Manual. Initially, as per paragraph 19, "any Supervisor so assigned by the Commissioner upon request by the Special Investigations Unit Commanding Officer and, otherwise, by a member of the Special Investigations Unit" is assigned to investigate and then, as per paragraph 20, evidence is secured, the complainant is interviewed, as is the employee and witnesses. The interviews are to be recorded in their entirety.

28.    As noted, no interview of the complainant was ever conducted.

29.    Saetta was never interviewed pursuant to the procedures of section 124.03. He was not afforded the opportunity to consult with union representation or have a union representative

---

[4] Even so, Chandoo, being of equal rank to Plaintiff, had no legal command authority over him and could not order Plaintiff to do anything.

present during an interview. He was not provided with sufficient information to reasonably apprise him as to the allegations. Thirteen days after the incident in question, Saetta was called into a meeting with Captain Greer and Sergeant Hanlon, without the benefit of union representation, and told his probationary period was under review.

30.    On December 17, 2023, Plaintiff effected a required DWI arrest, completing all aspects of his field training. Officer Chandoo sent Plaintiff a text message confirming that the arrest was good and later congratulated him on passing field training.

31.    On December 19, 2023, Plaintiff was called into Captain Greer's office and was told that Commissioner Raynor was reviewing Ms. Pascariu-Costo's complaint and was deciding whether Plaintiff would fail his probation as a result.

32.    On December 20, 2023, Plaintiff was informed that Raynor had told multiple people, both within and outside the DPS, that the entire issue revolved around Plaintiff having written over a PBA card.

33.    On or about January 9, 2024, without any additional investigation by superiors, Officer Chandoo was directed to complete all "Probationary Officers Evaluation Reports" for Plaintiff and backdate them, thus falsifying official documents. This was also in violation of Westchester DPS Department Manual §108.03 §8 for two reasons: 1) because Chandoo was not an FTO and therefore not authorized to fill out the reports in the first place as per DPS and NYS DCJS policy; and 2) because the evaluations were to be completed "each day on work performed that day."

34.    Plaintiff was given passing grades of 4 on all evaluation reports, except for December 6, 2023, where he was scored a 1. Chandoo's evaluation for December 6 states, "P.O. Saetta needs to show more ***discression*** [sic] and professionalism with dealing with the public. He

needs to show more honesty and integrity when dealing with review of negative incidents and be more fourth [sic] coming when dealing with the public. P.O. Saetta needs to be honest with his FTO and peers when dealing and reviewing incidents that may be difficult" [emphasis added]. Despite the December 6 report, based on the scores of 4 on all other reports, Plaintiff passed field training.[5]

35.    On January 12, 2024, Plaintiff was again called into Captain Greer's office. Sergeant McNulty from Internal Affairs was also present. Greer told Plaintiff that he was terminated from his position, handed Plaintiff a letter to that effect, and placed Plaintiff on administrative leave through January 31, 2024.

36.    After leaving Greer's office with McNulty, McNulty expressed confusion as to how Plaintiff wound up terminated, as Internal Affairs should have had been notified of any allegations of misconduct but had no information about any allegations against Plaintiff and had not conducted an investigation.

37.    Plaintiff spoke with his union President and counsel later that day, who both confirmed that they had spoked to Raynor, that Plaintiff was being terminated for writing over a PBA card, and that no one had ever been fired for this previously (possibly because no one else was probationary).

38.    To add confusion to this matter, perhaps in an attempt to avoid the consequences of his actions, Commissioner Raynor sent a letter to Plaintiff on January 22, 2024 that read, in pertinent part:

> This communication will confirm that Police Officer Joseph Saetta separated from service with the Westchester County Department of Public Safety effective January 31, 2024. This separation of service was during his probation and was neither a "removal for cause" as such term is defined by

---

[5] If Chandoo had been a trained and certified FTO to begin with.

> 9 NYCRR 6056.2(h) nor a "removal during a probationary period" as such term is defined by 9 NYCRR 6056.2(i),
> Police Officer Saetta has never, during his employment by the Westchester County Department of Public Safety, been the subject of a disciplinary investigation or been the subject of any of misconduct, including such misconduct as is described in 9 NYCRR 6056.2(h)(1).

39.     From the time of the initial traffic stop in question until his termination date, Saetta had many conversations with members of the DPS, members of the PBA, public officials, the public, family, friends, and acquaintances about the public policy issues surrounding police discretion and PBA cards, as well as the absurdity of the DPS policy that no PBA cards should be written over.

40.     During this time, Saetta also came to realize that the requirement of making a DWI arrest during field training was also illegal, as it violated New York Labor Law against law enforcement quotas. This, he realized, was also an issue of public concern that needed to be addressed—not only within his workplace where it appeared clear his opinions were not welcome, but with members of the public and government who might be able to make changes. This requirement has been confirmed by DPS Captain Greer in the attached affidavit, and the fact that a probationary DPS officer cannot get promoted without making a DWI arrest goes directly against the language of New York Labor Law § 215-a. [6]

---

[6] New York Labor Law § 215–a provides that:
No employer or his or her duly authorized agent shall transfer or in any other manner penalize or threaten, expressly or impliedly, an employee as to his or her employment in a manner, including, but not limited to, a reassignment, a scheduling change, an adverse evaluation, a constructive dismissal, **the denial of a promotion**, or the denial of overtime, based in whole or in part on such employee's failure to meet a quota, established by his or her employer or his or her duly authorized agent, of (a) tickets or summonses issued within a specified period of time for violations of provisions of law for which a ticket or summons is authorized by any general, special or local law; or (b) arrests made within a specified period of time for violations of provisions of law for which such arrest is authorized by any general, special or local law; or (c) stops of individuals suspected of criminal activity within a specified period of time.
N.Y. Labor Law § 215–a [Emphasis added].

41.     All of these conversations—about the PBA card policy, the DWI arrest policy, and their various impacts on the public and the DPS, were outside the scope of Saetta's normal employment, whether outside his chain of command or to members of the public or to people he thought could make a difference.

42.     Saetta's first conversations of this nature were with members of DPS, and they occurred between December 6 and January 12, 2024, both on and off duty. These conversations were as follows:

a.     With P.O. Stephen Samuel, he discussed the traffic stop in question, the PBA card Policy, P.O. Guziczek (as outlined below), P.O. Chandoo (both with respect to the traffic stop and as to his deficiencies as a Field Training Officer, including multiple instances of his being caught sleeping on the job), and the DWI quota.

b.     With Sgt. Michael Hagan, the traffic top, the PBA card policy, P.O. Chandoo as outlined above, and the DWI quota. Sgt. Hagan in turn spoke with the Command Staff about some of these concerns.

c.     Sgt. Brian Bosan, on December 19, regarding the absurdity of the commissioner contemplating taking disciplinary action. Sgt. Bosan met with the Commissioner and Commissioner Raynor indicated that no discipline was forthcoming.

d.     P.O. Mohammad Chandoo himself, following the traffic stop complaint, regarding P.O. Guziczek's situation, as outlined below, as well as other officers who had been disciplined for writing over PBA cards.

e.     P.O. Christopher Guziczek, when he picked Saetta up from his airport post on their way back to DPS headquarters. He stated that he had been written up for writing over PBA cards but he was not a probationary officer and could not be fired. They

discussed the DPS unwritten policy of not writing over PBA cards that Saetta was previously unaware of and the ridiculousness of the policy.

      f.     P.O. Adelsy Castro, who approached Saetta in the interview room at DPS headquarters and stated that he was told and overheard supervisors discussing the fact that Saetta wrote over a PBA card and that they didn't like it. Saetta expressed his position on the policy to Castro.

      g.     P.O. Mathew Worth, on or about , regarding the traffic stop, the PBA card policy, and the DWI quota, which Worth found objectionable. Officer Worth reviewed the body camera footage and expressed his opinion that Saetta did nothing wrong.

      h.     Sgt. Rachel Santiago, on or about, January 11. As Saetta's supervisor, she asked why he had been reassigned to the airport post. He explained the situation and she expressed her shock at how he was being treated.

43.     Once he came to realize the extent of the problem at DPS, not just the threat to his own livelihood but the public policy implications of uneven police enforcement on DPS-controlled roads in Westchester, Saetta began having many more conversations with friends, family, colleagues, and connections in local government. These conversation occurred from December 2023 through January 2024, and continued thereafter. Among these were the following, much of which is repetitive:

      a.     Brandon Neider, a friend who works in local government, who provided the attached declaration. The conversations Saetta had with Mr. Neider are representative of the conversations he had with many of the people below. Relevant to this complaint, Saetta spoke with Neider on multiple occasions from later December 2023 through January 2024, and continues to talk to him today. While trying to find out what was going

on with his own job through his connections, Saetta repeatedly expressed his confusion about how an acting Police Commissioner could have a rule that was not only illegal in that it took discretion away from police officers in violation of their training by New York State DCJS but also potentially made police work more dangerous. On top of that, if everyone with a PBA card was getting a free pass, police enforcement was only going to be focused on a group of motorists unlucky enough not to know a cop.

      b.     Daniel Moriarty, a friend, who provided the attached declaration.

      c.     Joshua Rivera , a friend, with whom Saetta discussed the traffic stop, the PBA card policy, the DWI quota, the fact that other officers had been disciplined for writing over PBA cards. During these conversations they discussed the disparate impact the PBA card policy had on different groups of people, including racial minorities, and how the public would react if they knew about that policy and the DWI quota.

      d.     Nelson Santana, a friend, with whom Saetta discussed the traffic stop, the PBA card policy, the DWI quota, the fact that other officers had been disciplined for writing over PBA cards. During these conversations they discussed the disparate impact the PBA card policy had on different groups of people, including racial minorities, and how the public would react if they knew about that policy and the DWI quota.

      e.     Johnny Camacho, a good friend, with whom Saetta had in depth discussions about the traffic stop, the PBA card policy, the DWI quota, the fact that other officers had been disciplined for writing over PBA cards. During these conversations they discussed the disparate impact the PBA card policy had on different groups of people, including racial minorities, and how the public would react if they knew about that policy and the DWI quota.

f.      Jonathan Garcia, a friend, with whom Saetta discussed the traffic stop, the PBA card policy, the DWI quota, the fact that other officers had been disciplined for writing over PBA cards. During these conversations they discussed the disparate impact the PBA card policy had on different groups of people, including racial minorities, and how the public would react if they knew about that policy and the DWI quota.

g.      Gabriel Salameh, a friend, with whom Saetta discussed the traffic stop, the PBA card policy, the DWI quota, the fact that other officers had been disciplined for writing over PBA cards. During these conversations they discussed the disparate impact the PBA card policy had on different groups of people, including racial minorities, and how the public would react if they knew about that policy and the DWI quota.

h.      Benjamin Ahmadi, a friend, with whom Saetta discussed the traffic stop, the PBA card policy, the DWI quota, the fact that other officers had been disciplined for writing over PBA cards. During these conversations they discussed the disparate impact the PBA card policy had on different groups of people, including racial minorities, and how the public would react if they knew about that policy and the DWI quota.

i.      Daniel Masi, a friend, with whom Saetta discussed the traffic stop, the PBA card policy, the DWI quota, the fact that other officers had been disciplined for writing over PBA cards. During these conversations they discussed the disparate impact the PBA card policy had on different groups of people, including racial minorities, and how the public would react if they knew about that policy and the DWI quota.j.      Ryan Finn, a friend, on or about  , discussed

k.      Ahmedin Javoravac, a friend, with whom Saetta discussed the traffic stop, the PBA card policy, the DWI quota, the fact that other officers had been disciplined for

writing over PBA cards. During these conversations they discussed the disparate impact the PBA card policy had on different groups of people, including racial minorities, and how the public would react if they knew about that policy and the DWI quota.l.    John Tychyn, a friend, on or about  , discussed

        m.     Nicholas Kikis, a friend, with whom Saetta discussed the traffic stop, the PBA card policy, the DWI quota, the fact that other officers had been disciplined for writing over PBA cards. During these conversations they discussed the disparate impact the PBA card policy had on different groups of people, including racial minorities, and how the public would react if they knew about that policy and the DWI quota.

        n.     Giana Capone- Saetta's fiancée, who is also a member of law enforcement. He spoke with her about these issues almost every day from December through January and afterwards, specifically addressing the traffic stop in question, the PBA card Policy, P.O. Guziczek, P.O. Chandoo (both with respect to the traffic stop and as to his deficiencies as a Field Training Officer, including sleeping on the job), and the DWI quota. Ms Capone also provided a declaration, attached, with respect to certain aspects of Saetta's situation.

        o.     Dawn Saetta, a family member, with whom Saetta discussed the traffic stop, the PBA card policy, the DWI quota, the fact that other officers had been disciplined for writing over PBA cards. During these conversations they discussed the disparate impact the PBA card policy had on different groups of people, including racial minorities, and how the public would react if they knew about that policy and the DWI quota.

p.      Joseph A. Saetta, a family member, consistently throughout this time period, specifically discussed the PBA card policy, the DWI quota, the fact that other officers had been disciplined for writing over PBA cards. He also personally observed P.O. Chandoo sleeping on duty.

q.      Johnny Schembari, a family member, with whom Saetta discussed the traffic stop, the PBA card policy, the DWI quota, the fact that other officers had been disciplined for writing over PBA cards. During these conversations they discussed the disparate impact the PBA card policy had on different groups of people, including racial minorities, and how the public would react if they knew about that policy and the DWI quota.

r.      Nancy Nocera, a family member, with whom Saetta discussed the traffic stop, the PBA card policy, the DWI quota, the fact that other officers had been disciplined for writing over PBA cards. During these conversations they discussed the disparate impact the PBA card policy had on different groups of people, including racial minorities, and how the public would react if they knew about that policy and the DWI quota.

s.      Annie Guadagno, a family member, with whom Saetta discussed the traffic stop, the PBA card policy, the DWI quota, the fact that other officers had been disciplined for writing over PBA cards. During these conversations they discussed the disparate impact the PBA card policy had on different groups of people, including racial minorities, and how the public would react if they knew about that policy and the DWI quota.

t.    Vincent LaBarbera, a family member , with whom Saetta discussed the traffic stop, the PBA card policy, the DWI quota, the fact that other officers had been disciplined for writing over PBA cards. During these conversations they discussed the disparate impact the PBA card policy had on different groups of people, including racial minorities, and how the public would react if they knew about that policy and the DWI quota.

u.    John Koppenal, a family member, with whom Saetta discussed the traffic stop, the PBA card policy, the DWI quota, the fact that other officers had been disciplined for writing over PBA cards. During these conversations they discussed the disparate impact the PBA card policy had on different groups of people, including racial minorities, and how the public would react if they knew about that policy and the DWI quota.

44.    During this December 2023 to January 2024 time period, and in the months following, Saetta had multiple conversations around these same topics with former colleagues and supervisors in law enforcement, including the following:

a.    Christopher Strattner, who is employed at the Rockland County Police Academy, and with whom, on January 20, Saetta discussed the traffic stop, the PBA card policy, the DWI quota, the fact that other officers had been disciplined for writing over PBA cards. During these conversations they discussed the disparate impact the PBA card policy had on different groups of people, including racial minorities, and how the public would react if they knew about that policy and the DWI quota.

b.      Lt. Jesse Wollman, who is employed by the Village of Pleasantville Police Department,  and with whom, on January 12, Saetta spoke about the traffic stop and the DPS PBA card policy.

c.      Former Police Chief Keith Dworkin (who was Chief at the time) of the Town of Fishkill, with whom Saetta spoke prior to January 31st about the traffic stop, the PBA card policy, the DWI quota, and how the public would react if they knew about these policies.

d.      Mount Vernon Police Officer Mathew Barbara, with whom, on January 12th, Saetta discussed the traffic stop, the PBA card policy, the DWI quota, the fact that other officers had been disciplined for writing over PBA cards. During these conversations they discussed the disparate impact the PBA card policy had on different groups of people, including racial minorities, and how the public would react if they knew about that policy and the DWI quota.

e.      Town of Marlbourgh Police Chief Jerry Cocozza, who also works part time as a Police Sergeant for the Town of Fishkill) with whom Saetta spoke prior to January 31st about the traffic stop, the PBA card policy, the DWI quota, the fact that other officers had been disciplined for writing over PBA cards. During these conversations they discussed the disparate impact the PBA card policy had on different groups of people, including racial minorities, and how the public would react if they knew about that policy and the DWI quota.

f.      Town of Fishkill Sergeant Jason Murtagh, with whom Saetta spoke prior to January 31st about the traffic stop, the PBA card policy, the DWI quota, the fact that other officers had been disciplined for writing over PBA cards. During these

conversations they discussed the disparate impact the PBA card policy had on different groups of people, including racial minorities, and how the public would react if they knew about that policy and the DWI quota.

45.     After he was terminated, Saetta continued to speak out, giving interviews to multiple news outlets in Westchester County and New York City, both print and broadcast. He was also contacted by Congressman Mike Lawler's office and State Senator Bill Weber's office, each of whom interviewed him and expressed interest in investigating his allegations.

46.     As such, it was clear that these discussions about the use of PBA or other union courtesy cards to avoid discipline for infractions of law, and the use of DWI quotas addressed a matter of public concern. For example, Saetta observed, and discussed the fact with the individuals listed above, that in practice, people who have PBA Cards drive in a much more dangerous and unlawful ways because they do not fear getting traffic tickets, thus creating a hazard to public safety.

47.     In addition, Saetta noted and discussed with those listed above that white drivers in Westchester County were significantly more likely to have PBA cards than minority drivers. As such, minority drivers received traffic infractions at a higher rate than white drivers.

48.     From December 6, 2023, through his termination and until the present date, Plaintiff has repeatedly engaged in protected activity and speech by complaining about the DPS's unwritten rule regarding never writing over a PBA card.

49.     Plaintiff made these complaints outside the scope of his normal employment.

50.     These complaints were made both inside and outside of Plaintiff's workplace.

51.     Plaintiff often made complaints within his command structure to supervisors and to public officials outside the time of his scheduled work tours.

52. The complaints of preferential treatment and lack of enforcement of traffic infractions against motorists who possess PBA Cards is a matter of public concern in that, among other reasons, a) civilians who have these cards often drive in a reckless manner, without fear of being prosecuted, which puts the public at risk due to their reckless driving; and b) due to the fact that a disproportionate number of motorists producing PBA Cards after traffic stops are white, traffic tickets are disproportionately issued to members of racial minorities.

53. For the reasons stated above, Plaintiff was subjected to adverse actions due to his engagement in protected speech.

54. Such adverse actions taken against Plaintiff were done purposefully to deter Plaintiff, and others who could engage in protected speech, from engaging therein.

**FIRST CAUSE OF ACTION**
**AS TO DEFENDANTS TERRANCE RAYNOR, GEORGE LATIMER,**
**WESTCHESTER COUNTY DEPARTMENT of PUBLIC SAFETY, AND**
**WESTCHESTER COUNTY**
**FIRST AMENDMENT RETALIATION**
**DEPRIVATION OF FEDERAL RIGHTS UNDER 42 U.S.C. § 1983**

55. All previous allegations of this Complaint are incorporated herein as if fully set forth below.

56. All of the aforementioned acts of defendants, their agents, servants and employees, were carried out under the color of state law.

57. All of the aforementioned acts deprived plaintiff of the rights, privileges and immunities guaranteed to citizens of the United States by the First Amendment to the Constitution of the United States of America and in violation of 42 U.S.C. § 1983.

58.     The acts complained of were carried out by the aforementioned individual defendants in their capacities as public officers, with all the actual and/or apparent authority attendant thereto.

59.      The acts complained of were carried out by the aforementioned individual defendants in their capacities as public officers, pursuant to the customs, usages, practices, procedures, and the rules of Westchester County and the Westchester County Department of Public Safety, all under the supervision of ranking officers of said county and department.

60.      Defendants, collectively and individually, while acting under color of state law, engaged in conduct which constituted a custom, usage, practice, procedure, or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

<u>**SECOND CAUSE OF ACTION**</u>
<u>**AS TO DEFENDANTS TERRANCE RAYNOR, GEORGE LATIMER,**</u>
<u>**WESTCHESTER COUNTY DEPARTMENT of  PUBLIC SAFETY, AND**</u>
<u>**WESTCHESTER COUNTY**</u>
<u>**FIRST AMENDMENT RETALIATION**</u>

61.     All previous allegations of this Complaint are incorporated herein as if fully set forth below.

62.     Defendants' infringement upon and violation of Plaintiff's rights protected under the First Amendment to the United States Constitution were intended to harm Plaintiff, and to place a chilling effect upon the exercise of such rights by Plaintiff and other persons as is their right, as provided by the U.S. Constitution.

63.      Further, following Plaintiff's engagement in protected speech defendants unconstitutionally used the threat and eventual imposition of termination of employment in an effort to silence, intimidate, threaten, and prevent Plaintiff from disclosing the evidence of corruption and misconduct Plaintiff had been collecting and documenting to the public at large.

64. The aforementioned conduct resulted in a chilling effect on Plaintiff's speech in an effort to prevent him from engaging in protected speech; or alternatively, to ultimately discredit his speech.

65. Defendants' actions violated Plaintiff's First Amendment right to speak out as a citizen regarding matters of extreme public concern, which constituted a fraud on the public and a breach of the public trust – namely widespread corruption, illegal practices, and the manipulation of issuance of civilian infractions due to PBA Cards and maintaining and illegal quota system for DWI arrests that denies employees promotion unless such an arrest is made.

66. Defendants' aforementioned conduct was not authorized by law and instead constituted a continued attempt to restrain plaintiff's speech from ever being uttered, which is presumptively unconstitutional.

67. As such, Defendants' conduct was in direct violation of Plaintiff's right to freedom of speech as secured by the First and Fourteenth Amendments.

68. As a result of this violation, Plaintiff is entitled to compensatory damages, punitive damages, and an award of attorney's fees.

**THIRD CAUSE OF ACTION
AS TO DEFENDANTS TERRANCE RAYNOR, GEORGE LATIMER,
WESTCHESTER COUNTY DEPARTMENT of PUBLIC SAFETY, AND
WESTCHESTER COUNTY
VIOLATION OF NEW YORK CIVIL SERVICE LAW 75-B**

69. Plaintiff re-alleges and incorporates all paragraphs contained herein by reference to this Count.

70. New York State Civil Service Law § 75-b provides, in pertinent part: "A public employer shall not dismiss or take other disciplinary or other adverse personnel action against a public employee regarding the employee's employment because the employee discloses to a

governmental body information: (i) regarding a violation of a law, rule or regulation which violation creates and presents a substantial and specific danger to the public health or safety; or (ii) which the employee reasonably believes to be true and reasonably believes constitutes an improper governmental action."

71.     "Improper governmental action" is defined in the statute as "any action by a public employer or employee, or an agent of such employer or employee, which is undertaken in the performance of such agent's official duties, whether or not such action is within the scope of his employment, and which is in violation of any federal, state or local law, rule or regulation."

72.     Upon receiving Plaintiff's multiple complaints of corruption related to PBA cards made following the December 6 traffic stop, Defendants retaliated against Plaintiff as a public employee. Plaintiff filed several reports that attempted to redress Defendants' corrupt practices as described herein.

73.     These acts as defined by Civil Service Law § 75-b are classified as improper governmental action by a public employee. Plaintiff raised his concerns based on tangible evidence that caused him to reasonably believe Defendants engaged in improper governmental action.

74.     As a result of the foregoing, Plaintiff was terminated from his position, his career is irreparably damaged, and he sustained serious emotional distress and financial harm.

75.     As a result of Defendants' willful actions, they are liable to Plaintiff.

## FOURTH CAUSE OF ACTION
## AS TO DEFENDANT CORINNE PASCARIU-COSTO
## DEFAMATION

76.     Plaintiff re-alleges and incorporates all paragraphs contained herein by reference to this Count.

77.     On December 6, 2023, following a lawful traffic stop due to her driving with an expired temporary license plate, Defendant Corinne Pascariu-Costo ("Costo") tried to get out of a ticket by producing what was allegedly a police mini-shield and PBA Card to Plaintiff.

78.     Plaintiff exercised his discretion to issue the summons anyway.

79.     Shortly thereafter, Costo called Plaintiff's command and spoke to a supervisor to complain about him.

80.     Costo claimed that Plaintiff was discourteous to her, a claim belied by Plaintiff's body-worn camera footage.

81.     These statements had no basis in truth or fact, and were not authorized by Plaintiff in any way.

82.     Costo knew her claims to be untrue.

83.     Costo's call to Plaintiff's supervisor in a fit of pique was done with malice and the intention to cause Plaintiff to suffer an adverse employment consequence.

84.     As such, Costo defamed Plaintiff.

85.     Plaintiff was damaged by the false statements. These false statements led to reputational harm of Plaintiff by the creation of a false impression of his character. These false statements also caused damage to Plaintiff and his career, including but not limited to among colleagues, supervisors and management at DPS. As the false statements were added to

Plaintiff's personnel file and will be reported to New York State, the damage to Plaintiff was severe and ongoing.

86.        Plaintiff has been damaged in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
## AS TO DEFENDANT CORINNE PASCARIU-COSTO
## DEFAMATION PER SE

87.        Plaintiff re-alleges and incorporates all paragraphs contained herein by reference to this Count.

88.        A false statement constitutes defamation per se when it charges another with a serious crime or tends to injure another in his or her trade, business, or profession.

89.        As set forth above, Costo communicated false and defamatory statements to DPS employees regarding Plaintiff that defamed Plaintiff's character and reputation and injured Plaintiff in his business and profession.

90        The false statements made by the Defendant concerning Plaintiff are defamatory *per se*, and malign his honesty, trustworthiness, dependability and professional reputation and character and harm his business affiliations.

91.        The defamatory statements damaged Plaintiff financially and emotionally.

92.        Plaintiff has been damaged in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION
## AS TO DEFENDANT CORINNE PASCARIU-COSTO
## INTERFERENCE WITH BUSINESS RELATIONS

93.        Plaintiff re-alleges and incorporates all paragraphs contained herein by reference to this Count.

94.        Costo's actions, which led to the termination of Plaintiff's employment, have interfered with Plaintiff's business relations, including prospective and future earning capacity.

95.     Costo's actions have made it extremely difficult for Plaintiff to secure employment with a New York State law enforcement agency. Despite numerous applications, Costo's false narrative has been propagated throughout the law enforcement community.

96.     Costo's interference was intentional and done solely with malice and with the express purpose of causing harm to Plaintiff's livelihood.

97.     Plaintiff has been damaged in an amount to be determined at trial.

## JURY DEMAND

98.     Plaintiff demands a trial by jury of all issues in this action that are so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

a. Award compensatory damages for the back pay, front pay, pain, suffering, emotional distress, loss of dignity, humiliation, and damages to reputation and livelihood endured by Plaintiff and all other damages afforded to Plaintiff by statute or otherwise in an amount to be determined at trial;

b. As to the First, Second and Third Causes of Action, hold all defendants therein joint and severally liable for the actions of any and all of the named defendants therein, for an amount to be determined at trial;

c. As to the Fourth, Fifth and Sixth Causes of Action, hold Defendant Costo liable for an amount to be determined at trial, and

d. Grant Plaintiff such other and further relief as may be required in the interest of justice.

Dated:  Hempstead, New York
          May 30, 2025

                                 Yours, etc.

                                 BRILL LEGAL GROUP, P.C.

                                 By: Peter E. Brill
                                 Attorneys for Plaintiff
                                 64 Hilton Avenue
                                 Hempstead, NY 11550
                                 (516) 206-2002